ELLIS, Judge.
Plaintiff was a passenger in the car of Alton J. Myers on the 23rd day of June, 1955 at about 11:30 P.M. when it was involved in an intersectional collision with a car owned and being operated by the defendant, Trudeau J. Hogue, and as a result thereof plaintiff has filed this suit in which he is claiming damages for injuries allegedly suffered as a result of the collision to his back. Plaintiff requested and obtained a trial by jury which resulted in a judgment dismissing his suit and it is from this judgment that he has perfected his present appeal, to this court.
Defendant in his argument and in his brief did not and does not contend that the plaintiff was guilty as a passenger of any contributory negligence nor that the defendant Hogue was not guilty of any negligence. Defendant contends only that the verdict of the jury is correct and that the refusal of the trial judge to grant a new trial was also correct for the reason that the plaintiff failed to prove that he -had suffered any damages as a result of the accident. On the other hand it is plaintiff’s contention that as a result of the collision he has proven that he suffered an injury and that as a result of such injury suffered a great deal of pain over a long period of time and that although he attempted to work he' could not do so continuously due *878 to extreme pain in his back brought about by his efforts to work, and, therefore, on numerous occasions he had to discontinue his work. As in practically all cases of this nature the court is again faced with a question of fact, and a discussion of the evidence revealed by the record is pertinent and necessary.
The record reveals that the defendant Hogue was traveling north on Pembroke Avenue which is a gravelled street in the city of Baton Rouge, just prior to the collision, and that Alton J. Myers was traveling east on 70th Avenue, which was a blacktopped street. The Hogue car had been traveling 20 or 25 miles per hour but had slowed down to approximately eighteen, while the Myers car was traveling 20 to 25 miles per hour at the time he applied his brakes some 10 to 15 feet from the point of impact. The left front part of the Hogue automobile struck the right front fender and side of the Myers automobile and after the impact the Hogue automobile spun around and was turned around at about a 180-degree angle and had traveled no further north than the point of impact, while the Myers car continued 15 or 20 feet across to the north side of 70th Avenue and stopped in the ditch.
Immediately after the Myers car came to a stop Myers testified on direct examination that plaintiff, before either got out of the car, asked him if he was hurt and he told him he was just shook up a little bit, whereupon Myers asked the plaintiff if he was hurt and he said: “I don’t know if I am hurt or not. I don’t believe I am. * * * I had a wreck before this and it might have hurt my back some more. My back was hurt in a wreck that I had before.” On cross-examination Myers added to this direct testimony the fact that the plaintiff asked him if he had insurance and he told him that he did not have any. He also testified when asked if the plaintiff had not unequivocally told him that he was not hurt that: “I don’t know. Seemed like he did tell me, ‘No, I am not hurt. I don’t believe I am hurt.’ Seemed like he did say that.” Pie also stated under cross-examination that plaintiff stated “I hope that other man’s got insurance,” and at the same time plaintiff told him that he had had a previous wreck in a car and the record shows that in this wreck he fractured a vertebra. However, the medical testimony is positive that if there was any injury as a result of the accident in the case at bar it had no connection with the prior injury and wreck. It is also shown that in April, 1956 Myers gave a statement to Mr. L. H. Strickland to the effect that he knew plaintiff did not get hurt in his wreck.
The accident was investigated that night by two police officers. One of them, De-ville, talked to plaintiff at the scene and the latter made no complaint of any kind whatsoever nor did he tell the police officer that he was a passenger riding in the Myers car at the time of the collision. The report of the investigation did not list plaintiff as a passenger or as a witness nor that he had suffered any injury whatsoever.
The following day plaintiff called his present attorney who had represented him in the previous case and was told to have x-rays taken by Dr. Malen which he did. At the direction of plaintiff’s attorney the x-ray report was sent to Dr. Wm. IT. Moody, a general practitioner of Baton Rouge. This report showed no evidence of fracture or dislocation. In fact, the x-rays were negative for any objective findings.
On the 27th day of June, 1955 or approximately four days after the accident, plaintiff reported to Dr. Moody and told him of the accident and injury to his back and pain. On the first examination Dr. Moody testified that plaintiff “had a low tortion (torsion) type back injury with lumbo-sacro and sacroiliac strain. There was spasm of the muscle surrounding the back called the paravertebral muscles and he was having the pain over the sixth, seventh and eighth thoracic vertebra.” It was further the opinion of this doctor that plain *879 tiff’s condition on June 27, 1955 “assuming his history is correct,” could well be attributed to the automobile accident. Dr. Moody did state that he believed the man’s history and thought that his pain and injury was a logical result. Dr. Moody again saw the plaintiff on July 5th and recommended a hard bed as his findings on this date were practically the same as on June 27th. He also instructed him to take a series of exercises “to relieve some of the spasm in his hack,” and also gave him a prescription for tablets to relax the muscles and which also contained a quarter of a grain of pheno-barhital. Plaintiff was again examined by this doctor on July 19th at which time he thought he had improved to the point that the doctor wanted him to start on light duty and see after two or three weeks of such duty whether he would not have improved so that he could go back to hard work. On this visit Dr. Moody stated there was a definite improvement “in the spasm and pain that the man was having.” Plaintiff visited Dr. Moody next on October 10, 1955 and told him that he was doing some work but that his back was still hurting him when he stood up or did any lifting. In addition the plaintiff had been complaining of headaches and on this occasion again so complained. The doctor recommended his continuing on a hard bed and taking exercise and the tablets and in addition recommended a lumbosacral support which plaintiff obtained. On November 2nd Dr. Moody again saw the plaintiff who still complained of his back paining him and that it had not improved on lifting or on any amount of twisting. Dr. Moody as a result of this visit and examination wrote a letter to plaintiff’s attorney in which he stated that “there was this small percentage of residual present * * * ”, and in his own mind he could not understand why plaintiff still complained and he therefore recommended that he be seen by an orthopedic surgeon. Dr. Moody did not see the plaintiff again until October 20, 1956 at which time he was still complaining of headaches and of his back. Plaintiff did tell him that he was all right unless in his work he did any lifting or twisting or bending. Dr. Moody’s final conclusion as shown by his testimony was that at the time of the trial he thought that it would take six months to a year for the plaintiff to become well from what he diagnosed as “chronic low back strain.”
Dr. Campanello, an orthopedic surgeon in the city of Baton Rouge, testified that he first saw and examined the plaintiff on November 11, 1955 and that his initial examination revealed some muscle spasm and tenderness on both sides of plaintiff’s back, particularly in the region of the lumbosacral area, that is, the lower part of the back. He also found some tenderness over the right side of his back and directly over the joint. He examined the x-rays which did not show any evidence of either bone or joint damage and were “essentially negative.” He recommended some type of support and told plaintiff that he would contact Dr. Moody. Dr. Campanello next saw plaintiff on the third of January at which time he felt that there had been a great deal of improvement and his findings were limited and he stated that plaintiff was able to go back to work. Plaintiff returned to Dr. Campanello on February 6 stating that he tried to1 work driving a gravel truck but that the jarring of the truck caused a pain in his back and that he eventually had to discontinue this type of work. Plaintiff’s only complaint on this visit was “a little low back pain and headaches early in the morning.” Dr. Campan-ello on the occasion of this visit still found a little spasm on the left side. His diagnosis was a chronic strain of the back muscles which he distinguished from a sprain. It is to be remembered that Dr. Moody diagnosed it as a sprain but testified that the two words were used interchangeably. On the 24th of February, 1956 plaintiff came back to Dr. Campanello with a stiffness of the neck and a description of a severe pain in the lower part of his back as a result of attempting to rake some leaves. Dr. Campanello testified that he felt that *880 an active use of plaintiff’s back would more or less eliminate the spasm and eliminate his disability. He further stated that he estimated plaintiff’s disability at approximately five to ten per cent insofar as the use of his back as a whole was concerned and he felt that this was temporary in nature. This doctor again saw the plaintiff on April 16, 1956 and plaintiff’s complaints were approximately the same with very little positive findings by the doctor other than a stiffness of the back muscles. Again on the 25th of September, 1956 plaintiff visited the doctor with the same complaint of headaches and pain in the neck as well as back pain whenever he attempted to stoop. He examined him again on October 22, 1956 and stated the result was negative, and at this time plaintiff admitted that he was “feeling fine and that he had very little complaints other than the ones mentioned,” viz., pain in the back of the neck and pain in the left leg with a numb feeling.
Dr. Campanello was asked on direct examination whether with the type of findings that plaintiff had it would in any way interfere with his doing heavy manual labor, the type of work that would require lifting heavy objects and he said: “I don’t think so.” He also testified on direct examination that plaintiff should have continued to work in spite of his soreness and that at the time of the trial plaintiff was able to do regular work. On cross-examination he testified:
“Q. Dr. Campanello, the complaint of pain that Mr. Langlois repeatedly gave to you on the occasions that you have related here, will you state frankly if you found objective symptoms to support that complaint in each and every instance? A. Yes. The only objective findings that he had was the minimal, which is hard to detect, spasms and tightness of the muscles when we attempted to stretch those muscles. That has been the only finding in all my examinations and repeated examinations.
“Q. And that finding, in your opinion, was not then nor, in your opinion as I understand it now, sufficient to be a cause, a real cause for Mr. Langlois to be unable to do work such as that for which he is qualified? A. That’s right, sir.
"Q. And I assume, doctor, that you know that, according to my information, Mr. Langlois usually does the type of work that would be in the category of labor? A. That’s right.
“Q. I further understand that he has worked several stretches with tree surgeons, David Tree Experts, Bor-skey’s tree people, which requires climbing and handling himself in trees, and so forth? A. Yes, sir.
“Q. And it is still your opinion he could do that type of work? A. Yes, sir.”
If we only had the medical testimony there is no doubt but that the verdict of the jury and judgment would be manifestly erroneous, but in addition we have testimony that the plaintiff, who had been working at the Cal-Metal Pipe Company, at the time of his injury, did not return to work there after the injury. He did undergo a physical examination when he went to work for the Cal-Metal company and nothing was found wrong with him at that time. After the accident and in the latter half of July, 1955 he went to work for a Mr. J. C. Borskey, helping in the drilling of water wells. Plaintiff stated that he worked two or three weeks. There is no record of the exact time. He then went to work on August 8, 1955 for Bor-skey who was engaged in tree surgery, which is a most strenuous occupation as it consists of sawing trees, limbs, climbing trees, sitting in a rope swing and working in trees, trimming trees and painting the spots or places after trimming. In doing this it entails stooping, bending, twisting, climbing, pulling, and lifting. Plaintiff followed this tree surgery work until the 30th of September. He returned to work on the *881 6th day of October for one day. The record of his work with Borskey in 1955 through the 6th of October was irregular and amounted to eight weeks at five days a week and one four-day week. It is plaintiffs contention that the irregularity was due to pain. Borskey testified that plaintiff returned to work one day on Feb. 2, 1956 and then March 1, 2, and 3, 1956. He next worked for Borskey in July, 1956, one week of five days. At the end of his work in July, 1956 he told Borskey that his back was hurting him and he could not climb the trees any more and as Borskey had no other work for him to do he laid him off. Borskey testified that he complained more to the foreman of his back than he did to him.
On cross-examination Borskey testified that plaintiff had worked for him in January, 1955 from the third to seventh; tenth to fourteenth, fifteenth to twenty-first; twenty-fourth to twenty-eighth and the thirty-first. He also worked in February, 1955 from the first to fourth, seventh to eleventh; fourteenth to eighteenth, twenty-first to twenty-fifth, and the twenty-eighth; March first to fourth, seventh, eleventh; fourteenth to eighteenth; twenty-third to twenty-fifth; twenty-ninth and thirtieth. In April, 1955 he worked from the fourth to eighth. Borskey testified that his work continued twelve months out of the year and that he kept a full force working all the time. A comparison with his work record with Borskey prior to his injury and subsequent thereto does not show much difference, in fact, he had more five-day weeks subsequent to the accident than he had prior thereto.
The work with Borskey was not all that the plaintiff did subsequent to the accident. After discontinuing his work with Borskey plaintiff states that he laid off “less than a month” and went back to driving a gravel truck for possibly a week or two but that the “bouncing and rolling” of the truck hurt his back. At this time he was working for John Goff. Plaintiff then testified that he laid off about three weeks and went back to work for Dempsey Young driving a truck hauling gravel and sand for two weeks. He did not quit this job but for some reason Young discontinued it and he thereafter “rested up” for approximately a few more weeks. Plaintiff stated after being questioned by his counsel that the work on the Young truck caused him pain, but the next job he got was driving a truck hauling dirt, for a Charles R. Wilson which he says that he did for “approximately two weeks or maybe two weeks and a few days.” After working for Mr. Wilson he “rested up a few more weeks and I went back to work for Mr. Borskey”. Plaintiff was in error in this and counsel reminded him that after he left Mr. Wilson he had gone to work for his brother and a Mr. Walker “topping, doing tree surgeons and taking trees up by the stumps.” He did testify that Walker and his brother did most of the heavy work.
After quitting the tree work with Bor-skey plaintiff obtained a job at a Billups service station and worked until about two or three weeks prior to the date of trial which was October 23 and 24, 1956. He stated that he stopped this work because he had no means of transportation and had been transferred too far from his home to walk. Plaintiff next testified that after discontinuing his work with Billups he “rested up a few days” and took a job with his brother and George Ruals “painting the sides of a house, the trim work like the windows and puttying windows.” The testimony also shows that the plaintiff’s memory is most faulty and he had to be constantly reminded by questions from his counsel. Plis wife testified that she had had to rub his back at night on some occasions but her testimony is not impressive as to any great pain or suffering on the part of the plaintiff.
The record fails to definitely show that the doctors knew that plaintiff was doing or had done the work outlined during the time of their examinations of plaintiff which probably would have changed their *882 opinion of plaintiff’s complaints. Thus, we have a case in which the jury and trial judge properly reasoned that the two cars collided at a most moderate rate of speed and that immediately thereafter plaintiff either said he didn’t think he was hurt or positively stated that he was not hurt but asked the driver, Myers, if he had any insurance and when told that Myers did not, stated that he hoped the other driver had insurance for he had injured his back previously in another automobile wreck and possibly it might be hurt in this one, or words to that effect. He failed to tell the investigating officers that he was a passenger in the car or that he was a witness or that he was injured in any manner, and the next day went to see the attorney who had represented him in his previous automobile accident, which, if he was really injured, would not be amiss but was rather inconsistent with his actions at and immediately after the collision, and it is strange that he did not go to see a doctor rather than his attorney if he were suffering as much pain as he stated on the trial. He did not see a doctor until the 27th of June, 19SS, or approximately four days after the accident. It is true that Dr. Moody found definite objective symptoms and was of the opinion that plaintiff’s complaints were well founded, while on the other hand, Dr. Campanello, while he found some objective symptoms, did not believe that the plaintiff’s injuries were disabling. The latter doctor’s diagnosis probably appeared correct to the jury and judge in that plaintiff several weeks after the accident went to work doing hard physical labor and continued doing so consistent with his work record prior to the collision and alleged injury until practically the date of the trial, and further, although the plaintiff testified that he had to quit these various jobs because of pain and suffering the record shows that he went right back to the same kind of work or harder work and that while he referred to the periods between his work as “resting up”, the fact that his work record subsequent to the injury compares favorably to his work record prior to the alleged injury would not render manifestly erroneous a finding that he did not suffer such pain as to disable him.
Thus, on the facts in the case we do not find any manifest error in the verdict of the jury or judgment of the lower court in holding that the plaintiff did not suffer any disabling injury so as to entitle him to damages therefor as a result of the collision.
The suit having been filed in forma pauperis the defendant is not liable for costs and the judgment of the district court is hereby amended in this respect. Hicks v. Royal Indemnity Co., 229 La. 536, 86 So.2d 183 and cases cited therein.
It is therefore ordered that the judgment of the District Court as amended be affirmed.